May it please the court, I'm attorney Robert Barnes representing Robert Raymond. This is a case concerning a petition circulator's right to circulate petitions in the state of Alaska. The district court's decision was so broad that no petition circulator would ever have standing in the state of Alaska to challenge that law. The district court's conclusion was, on page 10, we conclude that withholding review would not harm Mr. Raymond because the consequences of noncompliance with the residency requirement is merely invalidation of any petition circulated by Raymond. That would effectively negate his ability or any petition circulator's ability to ever challenge the law. However, a suppression of speech, which is what this law does, prohibits Mr. Raymond's and any non-resident's speech in the state of Alaska, which is penalized by the cause for which they engage in that speech, not being able to access the ballot, is a sufficient civil injury to give right to remedy in federal court. In fact, no court has ever suggested that a petition circulator's rights can be contingent or dependent upon the cause or campaign they're part of. They have their own independent rights to circulate petitions and advance the causes that they... Didn't we recently hold in Thomas v. Anchorage Equal Rights Commission that in order for you to have standing to show an injury in fact, you have to have a concrete plan, and that's the who, what, when, where, why. And that's what Judge Sedgwick was saying, is that you had not put forth sufficient facts to meet that standard. Two things about that, Treyarch. First, in the Libertarian Party v. Bowen decision, which was issued after the district court made its decision, there are two petition circulators where their only plan was to circulate petitions for future campaigns. That was their only intent. One had a particular campaign in mind, a state senate campaign in the future, but no known candidate, no known cause. The other one just said, in general, wanted to be able to circulate petitions on behalf of the Libertarian Party in the state of California. No particular, it didn't have to be in the middle of an election. The effect of the judge's ruling, and what the state urges the court to adopt, is that it should be in the middle of an election. The problem with that is that puts undue pressure on district courts to interfere in the middle of an election. It makes it difficult for the causes and candidates, because a decision might not be issued in time to have effective remedy for that election. But you agree that there has to be some concrete, something concrete that this person's going to do it. Yes, Your Honor. And here he gave that. It's important to note this was a... How is this concrete? He was doing it for somebody else. Your Honor, the concrete, this was at the motion to dismiss stage. So there wasn't any discovery, there weren't any affidavits. The Eighth Circuit decision, the government cites, was a summary judgment case, not a motion to dismiss. We have a case, Lopez, that tells it all. You don't even discuss Lopez. Come to Lopez and tell us why, under our definition of something concrete... Yes, Your Honor. ...that you comply. What is concrete in this particular instance, for example, in the ACLU case, what they had as concrete by the Ninth Circuit was just that they intended to circulate referendums and initiatives in future state or local campaigns. They didn't even know which it was. Here, what Mr. Raymond announced was that he had a long history of political activity, he'd circulated petitions before, he intended to come to Alaska to circulate petitions on behalf of a referendum initiative in the upcoming election. I thought this was on behalf of Mark Pickens. Your Honor, it was on behalf of a variety of petition circulators. A bunch of petition circulators had approached me. The first person I wrote the letter on behalf of was Mr. Pickens. Mr. Raymond ended up falling through the suit because of health issues with Mr. Pickens. But we've got Raymond's issue before us now, and it doesn't seem very concrete that what's actually before us is on behalf of somebody else about something that may happen in the future. Here, Your Honor, there was no dispute that the state of Alaska enforced the statute. And before, the only requirement that the Ninth Circuit has had was twofold component. In fact, the government concedes this on page 17 of their brief, which was self-censorship, there's no dispute that this constitutes self-censorship, and a well-founded fear that the state would enforce it, that second component. In Bowen, the Ninth Circuit found a well-founded fear just based on a website publication. Here, we had a specific letter to me saying they're going to enforce it against any non-resident petition circulator. But on Lopez, it says there must be more than hypothetical intent to violate the law. Lopez, the case you don't cite. Yes, Your Honor, but this is a First Amendment case. And First Amendment cases have taken a different doctrine of standing, and for two very good prudential reasons.  First, to not force these disputes to happen in the middle of an election campaign. For example, in Nader's campaign. But, counsel, there has to be an actual controversy. Absolutely. The hints are, I think, pretty clear case law about a concrete plan. So what's the best you've got to show that your client had a concrete plan? Oh, yes, Your Honor. He had been involved in Alaska political causes before. He was going to make his name available to circulate petitions in Alaska in the upcoming election campaign season. Did he ever identify a petition or a cause or anything particular he wanted to weigh in on? It hadn't reached that stage. This was just at the motion to dismiss stage. Was he specific about which election? The upcoming election. Well, which one is that? I'll have to go back. It was the upcoming election season for referendums and initiatives, which I guess I'd have to go back and look at which election season that was. How is his conduct, what he had to say about his plans, how is it different than the San Diego County case where we said, you know, it can't be a someday intention, it can't just be I'm going to maybe or I plan to do this in future. What's the difference? Your Honor, because it's a First Amendment case. And this is no different than ACLU where all they said was we're going to circulate referendums and initiatives in the 2000. Well, but our jurisprudence I'm speaking of is First Amendment. And in the First Amendment context, you still have to have a concrete plan. Yes, Your Honor. But here the concrete, in other words, I don't know of any concrete plan beyond I'm coming, I'm going to make my name available, I'm going to circulate petitions unless you're going to say it requires a specific campaign. And that before has never been required. And then to require a specific campaign, what happens is you have to file the suit while that campaign is ongoing and it's in the middle of an election campaign. So that's in the Bowen case, all they said was we're going to, one of the circulators didn't have even any specific campaigns. They said we're going to circulate in future elections. The other one said a future state senate campaign. Well, some of the cases that we're talking about, lest we gloss over them, in some of the cases there had been enforcement in the past. In some of the cases there were instances where the litigant was an entity that had had an annual event. So it was really clear they were going to continue. In one case it was an erotic art show in the First Amendment context, and they had it every single year. In fact, they had to get a TRO in order to have it. So there was a real strong history and track record of a very specific event, a very specific intention that seems entirely consistent with this notion of a concrete plan. And your client's statement seems to me to be quite qualitatively different. The only thing that he could have done more was simply wait until a particular cause he aligned with and he was going to be part of. But then by that point you're right in the middle of an election campaign. And in the Bowen decision, their concrete plan was just future elections. No, that's not right, counsel. I'm reading from the Bowen case, and the court said, Plaintiff Zegrella's plan answers those questions in who, what, when, where, why. In the next election he will support the state senate candidate in the district that overlaps with his house district. That is a very concrete plan. And you don't even say which election. I'm not familiar with how Alaska runs its elections. But if you say upcoming election in California, I can tell you, you know, we have state, local. We have an election, I think, in two days or something. So upcoming election can refer to many, many different things. Yes, Your Honor, but there was another plaintiff in that case the court found standing for, Theodore Brown, who had no plan beyond intending to gather signatures for candidacies in future elections but will be prohibited from doing so by state law, which was an earlier part of that paragraph. And there were two different plaintiffs in that case. I'm familiar with it because I assisted in it at the district court level. And he didn't have any specific plan. And the Libertarian Party just wanted to bring in anybody they could. And those were all people who had no, and California had no prior prohibition. The Secretary of State hadn't written a specific letter saying, yes, we will enforce this law. So it was different here. Here, Mr. Nader is someone who wants to circulate petitions, make his name available. The only other way he can go any step further is to wait for a campaign to happen. Now, the state suggests maybe he could come here and circulate petitions, but that would ineffectively invalidate those petitions and undermine the cause and campaign he's supporting because people will think they've signed a valid petition that will then be invalidated. Would you tell me specifically where you're referring to the other plaintiff? The other plaintiff, it's in the caption of the case, Your Honor, is Theodore Brown. I know, but where is it in the opinion that they talk about his standing? It's only by inference, Your Honor, in the prior paragraph when they say, the petitioners intend to gather signatures for such candidates in future elections but will be prohibited. I don't see that inference. I don't see that name in the paragraph. His name is not in the paragraph, Your Honor. It's in the caption. So you could have said, like, some specific election, some specific issue, some specific candidate. Instead, you do recalls, initiatives, referendum. It's just, you know, it's everything and anything. And that's the curious thing. Is he really going to do any of this? Oh, there's no question. He's a petition circulator. So he looks for campaigns to circulate for. When he finds them, he submits his name. He won't in Alaska because of this prohibition. So he's been involved in Alaska campaigns and causes before. Could he name one specifically? A specific Atlanta call? I didn't in the complaint. Well, that's the whole problem. We're looking at the complaint. And the district court said it's just insufficient. We're not going to have anything concrete here, any single specific. If he could have said, I helped gather stuff for somebody in this election and I have a specific somebody in mind for the next election. Well, he could have ran a leave to amend if that's the specificity he wanted. Did you ask for leave to amend? Of course. Yes, but he went broader. The district court's conclusion is what made it clear that the district court's view was there's no circumstances in which your circulator will have to go beyond the concrete plan. Let me disagree with you on that. I think you've misread what the district court did. If you look on page 11 of his order, the conclusion, he said, based on the foregoing analysis, defendant's motion to dismiss DACA 15 is hereby granted and plaintiff's complaint is dismissed without prejudice. Now, we know from working in the federal court, everybody knows working in the court, that there's two things you can dismiss. You dismiss the complaint and you can file another complaint, or you dismiss the action and the case is over. Specifically, Justice Sedgwick, and he's a very careful judge, he said that he dismissed the complaint without prejudice. That is, without prejudice of filing another complaint. Therefore, not only did he have in mind that you could file another complaint, but you filed your notice of appeal before the action was ever dismissed. I doubt we even have jurisdiction here. That's not my understanding that that's what occurred. Excuse me, what didn't occur? You mean I misread what Judge Sedgwick just said to you, his words? No, Your Honor, I didn't think of that. I filed a notice of appeal before you dismissed. Oh, yes, yes. There was never a dismissal. You never filed anything with the court saying, I'm going to stand on my pleadings and therefore. And you'll even, you'll look at the clerk's order that was entered, complaint dismissed without prejudice. There was never the action, there was never a dismissal. I understand that, Your Honor. It was that what he said in paragraph 10 at the end, is that he expanded his doctrine just beyond concrete plan. If concrete plan was it, then, in fact, this was discussed. But you agree, you agree he only dismissed the complaint, not the action. I don't understand, I guess I'm mistaken. Did you ever get a judgment? There's nothing to understand. All of us at Faxon Federal Court understand this. He dismissed only the complaint, not the action. You have to dismiss the action before we can have any jurisdiction. So no dismissal was ever issued? Well, the docket entry and there's two, the district court did two things on the same day. On February 8, 2013, docket number 19 is the order dismissing for lack of jurisdiction and docket 20 is the judgment. And those are two different, I'm not just reading from the docket. Okay, we have those as well in the record. The judgment is dated, I guess it's, I don't have the ER site for the judgment, but it's separate from the order and opinion. Okay, it's my understanding if a notice of appeal is prematurely entered, it's considered to be from the time of the judgment. No, what case do you have to substitute that? We either have jurisdiction or not. It's a little like being pregnant. You either have it or you don't have it. I understand that, Your Honor. This issue is new to me. I didn't realize that that had occurred until just now. Well, we always have to look into it, whether counsel can do it or not. It's our responsibility to make sure the court has jurisdiction. Yes, Your Honor. As to the second component, though, the court went beyond just concrete plan. This is what made it difficult to simply file an amended complaint when the court concluded that because the consequences of noncompliance with the residency requirement is merely invalidation of any petition circulated, there's no cognizable injury. That's much broader than just concrete plan. That's what made it seem futile to file an amended complaint and say, okay, I'm going to join this campaign. I'll be part of this cause. I'll be part of this. As this law cites, and I'm sure the government will cite in the future, it goes beyond just concrete plan and says no petition circulator can file suit and challenge or has standing to challenge the law in Alaska because the only injury is to the campaign rather than to the petition circulator. But that's never been held as grounds to suppress speech of more than 99% of Americans. So that's what was the practical problem in filing an amended complaint. All right. Thank you, counsel. Thank you, Your Honor.  May it please the Court. My name is Elizabeth Baclar, and on behalf of the Alaska Attorney General's Office, I represent Gail Fanumiai, Director of the Division of Elections. Can I just go to the last point because that's jurisdictional. Was a judgment entered in this case? Is there a judgment in the record? I believe it was, Your Honor, at Docket 20. I think the intent of Judge Sedgwick was to enter final judgment in this case. I read the two orders contemporaneously as triggering the appeal right. Where is the order? Is there an actual judgment entered? I look at Docket 20 as the judgment entered. Docket 19 is the order, memorandum decision. Docket 20, I view as the judgment. It says clearly the top judgment of the district court. So I believe that's in the record at page 20. You read Document 20 as a dismissal of the action? Not necessarily a dismissal. It says the same thing the district judge said. The plaintiff's complaint is dismissed without prejudice, which means without prejudice to file another complaint. Perhaps, Your Honor, but I think that both parties reasonably interpreted that caption. It's fine if both parties do it, but our law is clear. You can't stipulate the jurisdiction between the parties. And if a district judge, a careful district judge, says that they can get another shot at it, he's waiting for that other complaint, or he's waiting for the plaintiff to say, I'm going to stand on my complaint. Then he'll enter the judgment on the action. I see. And I guess, Your Honor, what I would say to that is that either way we have a jurisdictional failure here. So whether Mr. Raymond files a second, Mr. Raymond would need to file another complaint no matter what in this case. That would be our position. Essentially, even if he were to file a new complaint, it would have to contain some factual predicate, which is completely absent from the initial complaint. Or if a more specific final judgment needed to be entered that would trigger Mr. Raymond's appeal right, then at that point a complaint again would have had to be filed that actually generated some factual predicate. But assuming, I understand Your Honor's concern about this, but assuming that Docket 20 is to be interpreted as the final judgment from which this court does have jurisdiction to hear the case, we would argue that the factual predicate here is exceedingly different from the case law on First Amendment standing, exceedingly different from all of the Article III jurisprudence that this court has issued. Specifically, Mr. Raymond has had no contact at all with the State of Alaska. The only contact he has had is a letter from his lawyer on behalf of a totally different individual saying that he intends to circulate ballot petitions at some unknown point in time. Counsel, at a motion to dismiss stage, we have to accept his allegations as true, and he alleges that he's had contact with Alaska on several occasions. Well, he doesn't do so with any specificity, Your Honor. Well, that's different, but you just said he hasn't had any contact. And he alleges, I mean, we're clearly searching for a concrete plan here. I am, speaking for myself. So I don't want to lose that train of thought. But I think you just said he doesn't have any contact with any history with Alaska, and he alleges that he does. Well, he has no alleged intent to come here at any specific time. And a careful reading of the complaint, I think it's an excerpt of record of 57 to 62, I think he's very careful to say he's been active on behalf of political causes, Alaska political causes before and in the future, and intends to be so in the future. He doesn't actually say he's ever been here. He doesn't actually say he will ever come here. He says generally that he intends to be active on behalf of Alaska political causes, has done so in the past, intends to do so in the future. It's not at all clear from the record that he's ever set foot here or ever plans to. And in that vein, he doesn't allege that he's ever circulated a ballot petition here or faces any credible threat of prosecution or civil penalty. And these include – Why wouldn't he face a credible threat? He's got a letter from Gail Fanumiai saying we're going to enforce this. Well, I guess, Your Honor, that piece of it is – I think it's fair to say, in the record reflects that his petition would be discounted on the basis of his non-residency. But enforcement, as it's played out in all the cases, is a little bit more than that. And I don't know if that's because this factual pattern has never reached the case law or what, but essentially there are a series of – all the cases talk about civil penalties and criminal penalties and not simply what Judge Sedgwick identified as a more – it's just futility, futile expense, travel, expenditures, that kind of thing. That really doesn't beget the sort of enforcement that the case law contemplates, the credible threat of enforcement. But I think going to Your Honor's question on the concrete plan, that's where the standing of the plaintiff really fails, because there's absolutely no factual predicate at all. The record is devoid of any detail. And the First Amendment does not salvage this case, because a plaintiff can't salvage a complaint, simply can't create standing, generate standing, simply by inserting a First Amendment allegation into a complaint. What would he have had to do? Well, Your Honor, I think he would have had to do something clearly far more factually specific than what he did here. What exactly that is, I'm not sure. But at a minimum, I think he would have had to identify a ballot petition, a candidate, a cause, anything, anything specific. There is not a single case, I don't believe, that's been cited in the briefs that lacks that information. There's not a single case, I don't believe, that's been cited that has a situation like this, where there's just this sort of completely inchoate plan with no cause attached to it, no candidate, no measure. And he wants the court to strike down six provisions of Alaska law with no evidence of him ever having come into contact with those laws in any way. So it's your position there's not an actual conflict of interest? Absolutely, Your Honor. And that's where the court's jurisprudence on rightness merges here. Judge Sedgwick said in his order that Mr. Raymond is not a plaintiff with standing at this time. And I just look to speak to what Mr. Barnes said about how the only way to resolve cases like this quickly is if there's in an election context or there's something sort of untimely or expedient about trying to resolve a standing issue in the middle of an election. That's not the state's position that the only way to get these things resolved is in the middle of an election. I think, for example, in the amended complaint in the record, Mr. Barnes alleged that, Mr. Raymond alleged that the facts would be no different, or maybe it was in the briefing, the facts would be no different if Mr. Raymond intended to come up here and circulate a petition on 12B Bay, the Bristol Bay forever ballot measure. Well, with all due respect, we argued the facts would be very different in that situation. We would have an actual person with a plan to come here, a time frame, a measure he wanted to circulate, something more than just we think this law is unconstitutional and we think it would be expedient and convenient if the court would just say that. There needs to be something more than that, even under the more lenient First Amendment rubric. And Judge Roth, I believe, spoke to the Lopez case, and I think the Lopez case is very illustrative of the problem here. In Lopez, there was a student that had been disciplined by his college under a different part of policy, and the court found, this court found, that Mr. Lopez lacked standing because he was trying to challenge a different portion of the policy under which he was not being disciplined. And there the student had a real ongoing contact and controversy with the college and the professor. He was engaged in disciplinary proceedings with the college, and he was actually involved in the case in some way, and there was an actual factual predicate, and still the First Amendment claim made under that different part of the policy that he was not made subject to, that challenge was rejected because he had not had a concrete plan to violate that part of the policy. And so our position is that although the First Amendment creates a lenient standard, it does not create an avenue to completely circumvent Article 3. And I think whether it was the Getman case or the Thomas case, I can't recall which, but the self-censorship door to standing does not open for every plaintiff, and Mr. Raymond is a plaintiff on whom, if that door opens, it really is difficult to imagine where the door ever would close. So in effect, Mr. Raymond has presented nothing more than a wish to circulate unknown ballot petitions. He has no apparent connection to Alaska at all, except this hypothetical inquiry to Ms. Funumiay. And yet he invites the court to just strike off the books, these six provisions of Alaska law, in a factual vacuum. And if this court does that, our position is that will be a prohibited advisory opinion at this time, whether Mr. Raymond someday in the future becomes a plaintiff that actually has standing, whether that comes in the form of whether this court finds a lack of jurisdiction because there was no formal judgment entered and Mr. Raymond is invited to file a new complaint, or whether this court finds on the merits of the jurisdictional issue that there's no standing here. Either way, Mr. Raymond needs to perfect his claims, and he has not done that here. And Article 3, and even the First Amendment jurisprudence under Article 3, would be utterly frustrated were this court to find that this factual predicate is sufficient to exercise jurisdiction, whether on the more technical issue that Judge Ross mentioned, or the substantive merits of this jurisdictional standing issue. Unless the court has further questions, we rest on the briefs. All right. Thank you, counsel.
judges: WALLACE, WARDLAW, CHRISTEN